UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA MARIE STEWART-MATZEN,

        Petitioner,         Case Number 15-13050
                                     Honorable David M. Lawson
v.

SHAWN BREWER,

        Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Michigan prisoner Cynthia Marie Stewart-Matzen is presently in custody following her convictions that resulted from her attempts to burn down her house. After she was sentenced to prison, and obtained no relief from the Michigan appellate courts, she filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, alleging that the trial court should have suppressed certain evidence, including her statements to the police, and that her attorney mishandled the motion to suppress her confession. Finding no merit in any of the issues she has raised, the Court will deny the petition.

I.

      A fire occurred at the Matzen home in Belding, Michigan on May 13, 2010. After a two-year investigation, the petitioner was charged with intentionally setting the fire so that she could collect proceeds from her homeowner's insurance policy and her husband's life insurance policy.

      The petitioner and her husband, Gerald Matzen, dated for approximately 25 years. When the petitioner lost her employment — and her health insurance — she and Matzen decided to get married so that she could be added to Matzen's health insurance. They entered into a prenuptial agreement;

however, the petitioner became the beneficiary of Matzen's 401(k) plan and his life insurance. The house they lived in was insured for $100,000.

Matzen was not in good health and spent most of his time in his living room chair, where Stewart cared for him. He could walk short distances, but could not go up or down the stairs. About two months after he married the petitioner, Matzen awoke to smoke coming from the kitchen. He called 911 and called for the petitioner.

The fire department, fresh from another call nearby, arrived at the petitioner's house within two minutes. Fire Chief Gregg Moore and Captain Matt Smith assisted Gerald Matzen out of the house. When Matzen said that his wife was still in the house, Smith went back in for the petitioner. He found her in the kitchen "staring off into space," as if she were under the influence of something. When she did not respond to his calls, he pulled her from the house. Smith observed that the petitioner had significantly more soot on her face, compared to her husband's.

Once Matzen and the petitioner were out of the house, firefighter Timothy Lubitz and his partner, Captain Donald Eady, entered the house to put out the fire, entering through the side door. They noticed a set of stairs leading to the basement, with a small fire at the top of the stairs. They extinguished the first fire. They then proceeded down the stairs, when they came upon a plastic curtain on fire on the stair landing. They extinguished the second fire. They then came upon a small fire the size of a dinner plate on the basement concrete floor. They extinguished the third fire. Finally, they came upon a flaming box of kitty litter in the back room, which Lubitz extinguished with his boot, putting out the fourth and final fire.

Eady went back into the basement to inspect the scene. He heard something that sounded like air escaping and discovered a gas leak behind the washer and dryer. He could see that the

coupling nut was completely disconnected from the line. Eady immediately radioed instructions to turn the gas off to prevent an explosion. Firefighter Darryl Childs later inspected the gas line and noticed wrench marks on the copper line and no connection nut.

Michigan State Police technician Greg Stormzand began his investigation the next day and contacted the petitioner. After she signed a consent form, Stormzand entered the home and began his physical investigation of the property. Stormzand concluded that the fires were intentionally set with gasoline in a number of locations in the basement. Stormzand testified that he smelled a petroleum product and noticed burn patterns that indicated that a liquid had spilled down the stairs. A tested sample of charred carpet from the stairs and kitty litter confirmed that what he smelled was gasoline. Agreeing with the prosecutor's hypothetical question, Stormzand acknowledged that he would expect to see a considerable amount of soot on the face of a person who had started multiple fires, used a broom to push the flaming combustibles around the basement, started another fire, poured gasoline on the staircase, and then lit the staircase.

Before trial, the petitioner filed motions to supress Stormzand's investigation, alleging that his search of the home without a warrant violated the Fourth Amendment. She also filed a motion to supress certain statements she made to the police over the two-year investigation, contending that no *Miranda* warnings preceded questioning, and at times she was represented by an attorney. The trial court denied those motions, and all this evidence was considered by an Ionia County jury, which convicted the petitioner as charged of arson of a dwelling house, arson of insured property, and preparation to burn property. The petitioner was sentenced to concurrent prison terms totaling six to 20 years.

After sentencing, the petitioner's request for appointed counsel on appeal was denied. Her direct appeal deadline had expired by the time she was able to hire a lawyer. She filed a delayed application for leave to appeal, which the Michigan Court of Appeals denied in a form order, citing lack of merit in the grounds presented, but not offering any detailed reasons. *People v. Stewart-Matzen*, No. 321281 (Mich. Ct. App. April 28, 2014). The petitioner filed a late application for leave to appeal in the Michigan Supreme Court, which also was rejected on August 27, 2015 for untimeliness.

The petitioner then filed a timely petition for a writ of habeas corpus, in which she raised the following issues:

> I. THE TRIAL COURT ERRED WHEN IT DENIE[D] PETITIONERS [SIC] MOTION TO SUPRESS [SIC] EVIDENCE OBTAIN [SIC] WITHOUT A WARRANT[.]
>
> II. THE TRIAL COURT ERRED WHEN IT DENIED PETITIONERS [SIC] MOTION TO SUPRESS [SIC] PETIONERS [SIC] STATEMENTD [SIC] OBTAINED IN VIOLATION OF PETITIONERS [SIC] CONST. RIGHTS[.]
>
> III. RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HE INCORRECTLY FILED A MOTION TO SUPPRESS UNDER SIXTH AMENDMENT, INSTEAD OF THE FIFTH AMENDMENT[.]

Pet. at 32. The warden opposes the petition on the merits.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Because Stewart-Matzen filed her petition after the

AEDPA's effective date, its standard of review applies. Under that statute, if a claim was adjudicated on the merits in state court, a federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, ---, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks

and citations omitted)); *see also Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 841 (6th Cir. 2017); *Dewald v. Wriggelsworth*, 748 F.3d 295, 298-99 (6th Cir. 2014); *Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

Even though the state appellate courts did not give full consideration to the petitioner's federal claims on appeal, AEDPA's highly deferential standard for reviewing a habeas petitioner's constitutional claims applies here. The petitioner must show that "the state court decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law' or involved an 'unreasonable determination of the facts.'" *Kelly v. Lazaroff*, 846 F.3d 819, 831 (6th Cir. 2017) (quoting 28 U.S.C. § 2254(d)). That standard applies "even when a state court does not explain the reasoning behind its denial of relief." *Carter v. Mitchell*, 829 F.3d 455, 468 (6th Cir. 2016). "Under [*Harrington v. Richter*, 562 U.S. 86 (2011)], '[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on its merits in the absence of any indication or state-law procedural principles to the contrary.'" *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015) (quoting *Harrington*, 562 U.S. at 99). There is nothing in this record that suggests a basis for rebutting that presumption. *See Johnson v. Williams*, 568 U.S. 289, 133 S. Ct. 1088, 1097 (2013).

A.

The petitioner alleges that the trial court erred when it denied the petitioner's motion to suppress evidence that was obtained from her house without a search warrant. The petitioner raised

this claim in a motion to suppress in the trial court. The trial court denied the motion, finding that the petitioner signed a consent form prior to the search of her home.

That claim will not be addressed on the merits, because the petitioner cannot overcome the obstacle created by *Stone v. Powell*, in which the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 494-95 (1976).

The Sixth Circuit Court of Appeals employs a two-step analysis to determine whether a defendant was given a full and fair opportunity to litigate a Fourth Amendment claim in state court:

> First, the court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism.

*Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (internal quotations omitted).

Michigan provides ample opportunity for litigation of Fourth Amendment claims. Typically, such claims are addressed by means of a motion to suppress filed before trial. *See People v. Ferguson*, 376 Mich. 90, 93-94, 135 N.W.2d 357, 358-59 (1965) (holding that motions to suppress must be brought timely where the factual circumstances constituting the illegal arrest or seizure are known to the defendant in advance of trial). That is what the petitioner did here. The trial court found the evidence admissible (correctly) because petitioner consented to the search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (recognizing that consent is "one of the specifically established exceptions to the [Fourth Amendment's] requirements of both a warrant and probable cause"). The pretrial hearing evidence established that the petitioner signed consent forms

for fire investigator Joel DeKraker and Officer Greg Stormzand before the search of her residence. The petitioner was able to present her Fourth Amendment claim to the Michigan courts. The opportunity to litigate her Fourth Amendment claim therefore precludes habeas review. *Good v. Berghuis,* 729 F.3d 636,640 (6th Cir. 2013). The petitioner's first claim is barred on habeas review.

B.

The petitioner next alleges that the trial court erred by denying her motion to suppress statements obtained without first giving her *Miranda* warnings. The court conducted a hearing on that motion, and ruled from the bench that *Miranda* warnings were not required because the petitioner was not in custody when she made her statements to the police. The trial court stated:

> With regards to the initial interview by Officer Thomas, that was voluntarily arranged. It was a short interview of 20 to 30 minutes. There is no indication that she was in any way in cuffs or confined. It's related also to voluntariness, but there's no indication of any deprivation of food or water, or any concern so far as intelligence, or anything even that this Court, using an objective test, would cause this Court objectively to feel that Ms. Matzen was in custody. Listening to Ms. Matzen, here this afternoon, my inclination would be more in line with what the prosecutor has suggested. I don't know if I would call it a cat/mouse, maybe more so that maybe the officers met their mental match, but even in consideration with what Ms. Matzen has said, at best, what she felt is that it would be detrimental if she left. And I think that reason and common sense probably applies to any time the police ask to speak with you, whether it's a simple speeding ticket or something much more serious, you — you do have that inherent feeling that you do need to talk to the police, but that's not custody, that's human nature. I think even more telling was her comment so far as the honest person. Whether this is an indication of guilt or an indication of innocence doesn't really matter, but it's clear that Ms. Matzen wanted to be perceived as an honest person, and by that, again, felt compelled to talk to the police. It did not mean that she was in custody. It did not mean that this was a custodial interrogation triggering the *Miranda* warnings. It simply was one explanation as to why she continued to talk with people, whether they be police officers or a detective or anyone related to the police. That, again, is not custody. The — the short term interviews, the interviews being voluntarily arranged, the accommodations made for Ms. Matzen, even the open door in that last interview, all are suggestive of a non-custodial interrogation, and the Court does so find.

> With regards to the voluntariness of the — any statements made by Ms. Matzen to law enforcement or someone acting in behalf of law enforcement, there simply there are no red flags. There's nothing so far as her intelligence, no deprivation of food or water, no ext — or inordinate length of interview, no time frame so far as to happening at two o'clock or three o'clock in the morning. The only thing; and that's really not even related, is they wanted to talk to her husband separately, and asked her or told her to stay outside when they did that, but that, certainly, is not anything that would affect the voluntariness of her interview with them. I think, to the contrary, she continued to speak with anyone that asked, whether it be police officer, detective, investigator, or someone she thought was her friend, and I mean this with no disrespect, but I think Ms. Matzen, rightfully or wrongfully, wants to make sure that people get what she wants them to know. Whether that is an effort to evade prosecution or whether that's trying to be an honest person, I do not know and do not decide today. All I know is that there just are no red flags, no indications this was involuntary, no indications that it was custodial, and no triggering of the Sixth Amendment right.

Motion Hr'g Tr. at 67-69 (May 29, 2013).

The Fifth Amendment, applicable to the states by the Fourteenth Amendment, protects an accused against compulsory self-incrimination. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the prohibition against compelled self-incrimination requires a custodial interrogation to be preceded by advice that the accused has the right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel. *Id.* at 479. *Miranda* warnings are required when a suspect is in custody and subject to interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). Interrogation means express questioning or its "functional equivalent," which is defined as "any words or actions on the part of the police (other than those normally attendant to arrest or custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 300-01. Statements made during custodial interrogation without the benefit of *Miranda* warnings are inadmissible in court. *Dickerson v. United States*, 530 U.S. 428 (2000).

For the petitioner to enjoy *Miranda*'s protections, however, she must have been in custody when she made the incriminating statements. *Maryland v. Shatzer*, 559 U.S. 98, 111 (2010). And as the Supreme Court has explained — or, more accurately, declared — under the Fifth Amendment, there is "custody," and then there is "*Miranda* custody." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012) (stating that "[a]s used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion"). Even incarcerated prisoners may not be in "custody" for the purpose of *Miranda*'s warning mandate. *Ibid.*

For instance, in *Howes v. Fields*, the Supreme Court endorsed the idea that restrictions on an individual's freedom of movement alone will not establish *Miranda* custody. *Howes*, 565 U.S. at 509 (stating "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody" (quoting *Shatzer*, 559 U.S. at 112)). Instead, the determination of custody must be based on whether the subject is in a situation "'in which the concerns that powered the [*Miranda*] decision are implicated.'" *Id.* at 514 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). "[S]ervice of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Id.* at 1191.

The first step in making a *Miranda* custody determination is "to ascertain whether, in light of 'the objective circumstances of the interrogation,' *Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (per curiam), a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)." *Id.* at 509. Courts must examine "'all of the circumstances surrounding the interrogation'" to determine how a suspect would gauge her "'freedom of movement.'" *Ibid.* (quoting *Stansbury*, 511 U.S. at 322, 325). Factors relevant to this determination include the location of questioning, duration of questioning,

statements made during the interview, presence or absence of physical restraints during questioning, and whether the interviewee was released at the end of the questioning. *Ibid.* However, the freedom-of-movement inquiry "is simply the first step in the analysis, not the last." *Ibid.*

The trial court judge's determination that the petitioner in this case was not in custody at the time she made statements to the police was a reasonable determination of the facts and a proper application of controlling Supreme Court law. On May 25, 2010, the petitioner agreed to speak with Officer David Thomas of the Belding Police Department. She was not placed under arrest, nor was she placed in handcuffs or restrained in any way. The petitioner concedes that she willingly went to the Belding Police Department, but she alleges that the tone of the interview made her feel that she was in police custody. The petitioner is not entitled to *Miranda* warnings simply because the questioning took place in a police station or because she believed the officer viewed her as a potential suspect. *See Oregon v. Mathiason,* 429 U.S. 492, 495 (1977); *see also Biros v. Bagley*, 422 F.3d 379, 389-90 (6th Cir. 2005) (holding that the defendant was not "in custody" for *Miranda* purposes at the time he voluntarily presented himself at the police station and made incriminating statements to the investigating police officer).

The petitioner also insists that she was entitled to *Miranda* warnings when she met at a restaurant and gave statements to a confidential informant in July or August of 2010. The informant wore a live-transmission microphone to allow the police to listen in on the conversation. The petitioner spoke voluntarily with the informant and then left the restaurant. The petitioner also met on November 24, 2010, with Detective Michael Morey of the Michigan State Police, who posed as an employee of the Michigan Unemployment Insurance Agency. The petitioner contends that Morey improperly elicited statements pertaining to her assets, income, and marriage, which were used

against her at her trial. The petitioner testified that she initially was suspicious of Morey because she had already gone through one deposition with the insurance company.

The Supreme Court has held that "Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." *Illinois v. Perkins*, 496 U.S. 292, 300 (1990). The petitioner was not entitled to *Miranda* warnings when she was questioned by an informant at a restaurant or when questioned by Detective Morey in connection with her unemployment benefits because she was not in "*Miranda* custody." The Supreme Court has noted in passing that "a surreptitious conversation between an undercover police officer and an unindicted suspect would not give rise to any *Miranda* violation as long as the 'interrogation' was not in a custodial setting[,]." *Patterson v. Illinois*, 487 U.S. 285, 296, n.9 (1988).

The petitioner met again with Detective Morey in April, 2010, and wrote a note to Morey acknowledging that "[i]t was okay for me to talk to Detective Morey." She voluntarily sat in his car and answered questions. Once again, she was not placed in custody during the discussions with the informant at the restaurant, Officer Thomas, or Detective Morey, and she testified that she agreed to talk to the officers on each of the four occasions. Under the circumstances, the trial court judge reasonably determined that the petitioner was not in custody when she provided the statements. Because "[t]here is no indication that the questioning took place in a context where [the petitioner's] freedom to depart was restricted in any way", the trial court judge reasonably determined that the petitioner's statements were given in a non-custodial situation. *See Oregon v. Mathiason*, 429 U.S. at 495.

The petitioner has not shown that a habeas corpus writ should issue based on the admission at trial of her statements to the police.

C.

In her third claim, the petitioner contends that trial counsel was ineffective because she framed her motion to suppress the petitioner's statements to the police as a violation of the Sixth Amendment right to counsel rather than as a violation of the Fifth Amendment right. The petitioner submits that the Sixth Amendment was inapplicable because the Sixth Amendment right to counsel only attaches after the initiation of adversarial judicial proceedings by way of a formal charge, preliminary hearing, indictment, information or arraignment, and none of those had happened when she made her statements. The petitioner claims that trial counsel erred by failing to bring the motion to suppress as a violation of the Fifth Amendment right to counsel, which applies when an accused is in custody and subject to interrogation. As a result, the petitioner contends that had trial counsel not made this error and properly argued the correct violation, the trial court would have granted her pretrial motion.

The record does not support the petitioner's argument. Her trial counsel moved to suppress her statements on *both* Fifth (*Miranda* violation) and Sixth Amendment grounds.

A violation of the Sixth Amendment right to effective assistance of counsel is established only when an attorney's performance was deficient and the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that

the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Success on ineffective-assistance-of-counsel claims is relatively rare, because the standard for obtaining habeas corpus relief "is 'difficult to meet.'" *Woodall*, 134 S.Ct. at 1702 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013) (quoting *Richter*, 562 U.S. at 102)). The standard is "all the more difficult" on habeas corpus review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations and quotation marks omitted). "[T]he question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Ibid.*

Trial counsel's performance was not deficient when she challenged the admissibility of the petitioner's statements on two grounds: that 1) the statements must be suppressed because the defendant was in custody and the statements were made in violation of *Miranda*, and 2) the defendant's statements must be suppressed because they were obtained in violation of her Sixth

Amendment right to counsel. In the second part of her motion, counsel argued that the petitioner was represented by legal counsel before each of the interrogations and the police failed to inform the petitioner of her constitutional rights. Trial counsel also sought the suppression of the statements based on a violation of the petitioner's *Miranda* rights, due to law enforcement's failure to advise her of her right to counsel during an interrogation while in custody.

Moreover, in the written motion to suppress as well as in the arguments at the motion hearing, counsel clearly argued a *Miranda* violation, and the judge was aware of and ruled on that claim. The trial judge clearly understood that counsel alleged a constitutional violation based on lack of counsel during the police interrogations. The trial court judge found that the petitioner was not in custody and therefore not entitled to *Miranda* warnings. The petitioner cannot demonstrate that she was prejudiced by any mischaracterization of the constitutional violation. Therefore, the mischaracterization of a Fifth Amendment right to counsel as a Sixth Amendment violation would not have changed the outcome of the petitioner's motion to suppress.

The petitioner is not entitled to relief on her ineffective assistance of counsel claim.

III.

The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition and amended petition for a writ of habeas corpus are **DENIED.**

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: July 24, 2018

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 24, 2018.

s/Deborah Tofil
DEBORAH TOFIL